AO 106 (Rev. 04/10)  Application for a Search Warrant



SEALED

# UNITED STATES DISTRICT COURT

for the

Southern District of West Virginia

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.   3:18-mj-00030 |
| 761 Norway Avenue Huntington, West Virginia | ) ) |

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Southern _____ District of _____ West Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 USC Section 846 | Conspiracy to distribute controlled substances |
| 21 USC Section 841(a)(1) | Distribution of controlled substances |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Charles E. Irwin, Special Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 16, 2018

_____
*Judge's signature*

City and state:  Huntington, West Virginia

Cheryl A. Eifert, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

The property to be searched is the single family residence located at 761 Norway Avenue in Huntington, Cabell County, and within the Southern District of West Virginia.  The structure of the residence has a gray shingled roof with white vinyl siding. There is a small front stoop leading to the front door.  The front door is white with an oval window and is flanked by two rectangular windows.  The front yard is enclosed by a chain linked fence and there is a concrete walkway that leads to the front door.

Photo taken on 4/10/18:



## ATTACHMENT B

### Particular Things to be Seized

1.   Log books, notes, records, customer lists, ledgers, and other papers and property relating to the transportation, ordering, purchasing, processing, storage, and distribution of controlled substances, including but not limited to heroin.

2.   Receipts and other items related to money wire transfers and evidence of the transfer or concealment of money.

3.   Cellular telephones and electronic devices believed to be used to facilitate drug trafficking.

4.   United States currency and other financial instruments

5.   Photographs of assets, narcotics, or co-conspirators.

6.   The opening, search and removal, if necessary, of any safes or any locked receptacle or compartment, as items described in this attachment could be maintained within.

7.   Any papers or items indicating occupancy, residency, or rental.

8.   Drug paraphernalia and equipment, related to the sale, manufacture, processing and storage of controlled substances, including but not limited to scales, cutting agents, and packaging materials.

9.   All firearms and ammunition.

10.  Controlled substances including but not limited to heroin, fentanyl, and cocaine.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| IN THE MATTER OF THE SEARCH OF | Case No. 3:18-mj-00030 |
|---|---|
| 761 Norway Avenue<br>Huntington, West Virginia | **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Charles E. Irwin, being first duly sworn on oath, depose and say:

**I.   INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. Section 2703(c)(1)(A) for the residence at 761 Norway Ave, Huntington, West Virginia.  The target residence is described herein and in Attachment A, and the items to be seized are described herein and in Attachment B.

2.  I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  Specifically, I am a Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the Charleston, WV District Office.  In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, et seq.).  I have been employed as a Special Agent with the DEA since July 2014.  Prior to becoming a Special Agent, I served with the Durham Police Department as a police officer and

investigator.   In my experience as a law enforcement officer, I have participated in numerous narcotics investigations, during the course of which I have participated in physical surveillance, undercover operations, and executions of search warrants.

3.   I have completed the DEA Basic Agent Training Course as well as other training courses related to gangs and narcotics trafficking.   I have participated in narcotics investigations at both the local and federal level, and I have participated in numerous federal search warrants.   As a result, I have become familiar with methods of operation of drug traffickers and organizations.   As a Special Agent with the DEA, I have the responsibility of working with other federal and state law enforcement officers in investigations of violations of federal and state controlled substance laws, including the investigation of heroin, cocaine, methylenedioxymethamphetamine (MDMA), methamphetamine, marijuana and other dangerous drug organizations.

4.   I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking.   I have discussed and learned from other law enforcement investigators in regards to these matters as well.

5.    Based on my training, experience and conversations with other experienced narcotics investigators, I have gained experience in the techniques and methods used by drug traffickers to distribute controlled substances, their use of cellular phones and other electronic communication devices to facilitate their trafficking activity, and the methods used to conceal and launder the proceeds of said activity.

6.    Through my involvement as co-case agent in a federal Title III investigation, I have gained experience in that investigation involving the interception of wire communications. I have been directly involved in the review and deciphering of intercepted coded conversations between narcotics traffickers that were later corroborated by surveillance.    Throughout my law enforcement career, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local narcotics officers about drug traffickers and their use of cell phones to facilitate drug trafficking by, for example, using code during their conversations.    I have also received extensive instruction and practical training on intercepting communications and conducting coordinated surveillance while at the DEA Academy.

7.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. Section 841 (a)(1) have been committed, are being committed, and will be committed by Manget PETERSON, David MILLER and/or additional known

and unknown persons.  There is also probable cause to believe that items described in Attachment B are being maintained in the target residence and constitute evidence of these criminal violations.

8.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I have not included every fact concerning this investigation.  This affidavit is intended to show merely that there is a sufficient factual basis for a fair determination of probable cause to support the Application.

## II.  PURPOSE OF THIS AFFIDAVIT

9.   As described herein, there is probable cause to believe that the following offenses have been committed, and are being committed, by Manget PETERSON, Willie PETERSON, David John MILLER (hereinafter, "MILLER") and others known and unknown, as described herein:

a.   Distribution of, and possession with intent to distribute, controlled substances, to include heroin, in violation of 21 U.S.C. § 841(a)(1);

b.   Conspiracy to distribute, and to possess with the intent to distribute, controlled substances, to include heroin, cocaine, and methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and

c.   Use  of  communications  facilities  to  commit, facilitate,  or  further  the  above-listed  offenses,  in violation of 21 U.S.C. § 843(b).

10.  This affidavit is submitted in support of an application for a search warrant, all with respect to the following **Target Residence** which is further described in Attachment A, for evidence, fruits, and instrumentalities, as further described in Attachment B, of violations of the above listed statutes, committed by Manget PETERSON,  Willie  PETERSON,  MILLER,  and  others,  as  described herein.

11.   761 Norway Avenue, Huntington, West Virginia, which is described  as  a  single  family  residence  in  Huntington,  Cabell County, and within the Southern District of West Virginia.   The structure of the residence a gray shingled roof with white vinyl siding.   There is a small front stoop leading to the front door. The front door is white with an oval window and is flanked by two rectangular windows.   The front yard is enclosed by a chain linked fence and there is a concrete walkway that leads to the front door, also pictured in Attachment A.

### III. SOURCES OF INFORMATION

12.   I have obtained the facts set forth in this Affidavit through personal participation in the investigation, from oral and written reports of other law enforcement officers, from records, documents and other evidence obtained during this investigation,

from confidential sources and sources of information who are associated with, and knowledgeable about, the subjects of this investigation and their confederates, and from other sources of information as referenced herein. I have reviewed official reports prepared by other law enforcement officers participating in this investigation and in the other related investigations by agencies referenced in this Affidavit.

13. During this investigation we have monitored and/or recorded conversations between Confidential Sources and targets of this investigation. These conversations have been conducted in English. When I refer to these conversations in this affidavit, I am relying on summary translations that have been provided to me by investigators who are familiar and have worked extensively on this investigation or I have myself listened to the recorded conversations.

14. On January 16, 2018, U.S. District Judge Robert C. Chambers signed an order authorizing the interception of wire and electronic communications to/from three phones used by PETERSON, namely (304) 962-5007 (referred to as "TT1"); (313) 737-8714 (referred to as "TT5"); and (304) 942-4638 (referred to as "TT6"). In this affidavit, I refer to intercepted communications to and from (313) 737-8714 (TT5) and (304) 942-4638 (TT6). These communications occurred in English and I am relying on summaries

and/or transcripts that have been prepared either by myself or by investigators that have worked extensively on this investigation.

## IV.  PROBABLE CAUSE

15.  This investigation is being conducted by DEA Charleston, West Virginia State Police ("WVSP"), and DEA Detroit.  This investigation began after investigators debriefed a WVSP confidential source (hereinafter "CS1[1]") who offered to make a controlled purchase of heroin from an individual CS1 knew as "Money", who was distributing heroin in the Huntington, WV, area. Investigators showed CS1 a photo of PETERSON and CS1 identified PETERSON as "Money".  During October and November, 2017, investigators utilized CS1 to make multiple controlled purchases of various amounts of heroin from PETERSON ranging from one gram to one ounce.  These controlled purchases occurred on October 13, 2017; October 26, 2017; November 14, 2017; November 28, 2017; and November 30, 2017.  On the November 30, 2017 controlled purchase, PETERSON directed SYKES to sell an ounce.  The phones calls between CS1 and PETERSON to arrange these controlled purchases were

---

[1] CS1 is signed up as a cooperating source with West Virginia State Police.  CS1 is cooperating for monetary benefits.  CS1 has prior arrests and/or convictions for theft, grand larceny, shoplifting, receiving stolen property, possession of counterfeit money, possession of controlled substance, fugitive from justice, issuing worthless check, domestic battery, contributing to the delinquency of a minor, battery, petit larceny, and assault.  CS1 has a history of substance abuse and is a heroin addict.  CS1 has provided credible information that has been independently verified by investigators.  Investigators believe CS1 to be a reliable source of information.

recorded and the controlled purchases were also audio and video recorded.

16.   Investigators ultimately obtained court authorization, on January 16, 2018, to intercept the wire and electronic communications to and from three phones used by PETERSON, namely (304) 962-5007 (TT1); (313) 737-8714 (TT5); and (304) 942-4638 (TT6).

17.   Investigators began interception on January 17, 2018, and interception has confirmed that PETERSON is using (313) 737-8714 (TT5) and (304) 942-4638 (TT6) to facilitate his drug trafficking activities.   Investigators were informed by Verizon that (304) 962-5007 (TT1) was suspended due to nonpayment and to date, no wire or electronic data has been intercepted to/from (304) 962-5007 (TT1).

18.   This affidavit will highlight some of the drug related intercepted communication between Manget PETERSON and MILLER, along with the coordinated surveillance which showed that MILLER resides at 761 Norway Avenue, Huntington, West Virginia (**Target Residence**).   David MILLER is a heroin dealer in Huntington, West Virginia.   MILLER and Manget PETERSON both obtain heroin from Willie PETERSON.   MILLER also sends money to Willie PETERSON.   I will also discuss a recent traffic stop of MILLER in which a large amount of heroin and cocaine was seized after MILLER met with Willie PETERSON in Detroit, Michigan.

**A.   January 19, 2018:   Surveillance of John MILLER and Manget PETERSON**

19.   On January 19, 2018, investigators intercepted multiple calls between Manget PETERSON and his drug supplier, Willie PETERSON, where Willie PETERSON directed Manget PETERSON to meet with MILLER at the Walmart in Huntington, West Virginia, in order to combine their drug proceeds and wire the money to Willie PETERSON, who was waiting at a Walmart in Detroit, Michigan.

20.   More specifically, at approximately 6:28pm, Manget PETERSON, (313) 737-8714 (TT5) received an incoming call (session #147) from (313) 205-9544, used by Willie PETERSON.   Willie PETERSON told Manget PETERSON to call "John".   Willie PETERSON asked Walmart?   Manget PETERSON confirmed.   Willie PETERSON told Manget PETERSON that "John" is right down the street from Walmart.

21.   At approximately 6:49pm, Manget PETERSON, (313) 737-8714 (TT5) placed an outgoing call (session #149) to (313) 205-9544, Willie PETERSON.   Manget PETERSON told Willie PETERSON to "tell John to come on, man."   Willie PETERSON said that "John" is already up there.   Manget PETERSON told Willie PETERSON that he's going to call him "John".

22.   Manget PETERSON, (304) 942-4638 (TT6) then placed an outgoing call (session #373) to (304) 563-1864, which as discussed herein the user of this phone was identified as MILLER.   Manget PETERSON told MILLER that he will be there in about five minutes.

MILLER agreed to meet Manget PETERSON at that time at the Walmart on route 60 in Huntington, West Virginia.

23.  At approximately 7:08pm, Manget PETERSON, (313) 737-8714 (TT5), placed an outgoing call (Session #150) to (313) 905-2544. Willie PETERSON said he is still waiting for money to be sent. Willie PETERSON also said that MILLER sent him a text message that said Manget PETERSON was going to send the money. Manget PETERSON was waiting on MILLER, and Willie PETERSON said that MILLER must be in there somewhere (referring to Walmart).  Willie PETERSON then said that MILLER is about to pull up.

24.  At approximately 7:18pm, Manget PETERSON, (304) 942-4638 (TT6) placed an outgoing call (Session #381) to MILLER, (304) 563-1864.  Manget PETERSON asked how long it would be before MILLER pulled up.  MILLER told Manget PETERSON that he was passing the Speedway on Route 60.  Manget PETERSON asked if MILLER was going to send it.  MILLER said that Manget PETERSON could send it. Manget PETERSON said [unintelligible]…"a hundred what's it names" and he can't sell none of his "shit." MILLER also complained about having "bullshit."  MILLER told Manget PETERSON he was pulling up right now.

25.  Based on my training and experience, and that of those around me, I believe that in the above detailed call, Manget PETERSON complained to MILLER that he couldn't sell any of his "shit," which was code for heroin.  During this timeframe,

investigators had intercepted multiple calls from Manget PETERSON's customers and re-distributors where they complained about Manget PETERSON's heroin being no good.

26. At approximately 7:23pm, Manget PETERSON, (313) 737-8714 (TT5) placed an outgoing call (Session #152) to Willie PETERSON, (313) 205-9544. Manget PETERSON asks if MILLER had five, referring to $500. Willie PETERSON answered, "yea." Manget PETERSON then said he had eight, referring to $800. Manget PETERSON said, "it's going to be about 12 ($1,200), want me to send it all?" Willie PETERSON told Manget PETERSON to send it all, and that he is at the Walmart on 16th street in Detroit, Michigan.

27. At approximately 7:24pm, investigators were conducting surveillance at the Walmart on Route 60 in Huntington, West Virginia, in anticipation of the meeting between Manget PETERSON and the user of (304) 563-1864, whom Manget PETERSON referred to as "John". Investigators observed Manget PETERSON arrive at Walmart in a gold Buick sedan driven by Silas PARDUE, with Ashley PARDUE a passenger[2]. When the Buick parked, investigators observed Manget PETERSON meet with an individual we recognized as David John MILLER, via his West Virginia DMV photo. Investigators

---

[2] Silas and Ashley PARDUE are two of Manget PETERSON's primary facilitators, sometimes meeting with customers at Manget PETERSON's direction and sending money to Detroit on Manget PETERSON's behalf

watched Manget PETERSON, MILLER, Silas PARDUE, and Ashley PARDUE go into the Walmart together.

28.  At approximately 7:36pm, investigators watched Manget PETERSON, Silas PARDUE, and Ashley PARDUE leave the Walmart together in Silas PARDUE's gold Buick sedan.

29.  At approximately 7:40pm, investigators watched MILLER go through the checkout, and walk out to a red Kia Soul rental vehicle with a Florida license plate, DFRC46.  Investigators then followed MILLER and watched him drive to his residence, 761 Norway Ave, Huntington, West Virginia (**Target Residence**).

30.  As discussed above, Manget PETERSON was instructed by Willie PETERSON to meet with "John" at Walmart in order to send money to Willie PETERSON in Detroit, Michigan.  Furthermore, Manget PETERSON contacted the user of (304) 563-1864 to arrange this very meeting at Walmart on Route 60 in Huntington, West Virginia.  Based on the fact that investigators watched Manget PETERSON arrive at Walmart and meet with MILLER, as had been arranged with the user of (304) 563-1864, investigators believe MILLER is the individual referred to as "John" and the user of (304) 563-1864.

31.  Based on my training and experience, and that of those around me, I believe that in the above detailed calls, combined with the observations of investigators on surveillance, Manget PETERSON and MILLER met at Walmart in order to combine their drug proceeds and wire money to their shared drug supplier, Willie

PETERSON, in Detroit, Michigan.    Furthermore, after sending the money, MILLER did some shopping before returning to his residence, 761 Norway Ave, Huntington, West Virginia (**Target Residence**). Based on our investigation to date, we believe that MILLER is a drug trafficker in Huntington, West Virginia, lateral to Manget PETERSON, who shares the same supplier as Manget PETERSON, namely Willie PETERSON.

**B.    March 21, 2018:  Surveillance of MILLER and Willie PETERSON**

32. On February 15, 2018, investigators terminated interception of Manget PETERSON's phones.   Interception had allowed investigators to identify numerous co-conspirators to include Manget PETERSON's drug supplier, his brother, Willie PETERSON in Detroit, Michigan.   On or about March 8, 2018, DEA Detroit received court authorization to intercept the communications to/from Willie PETERSON's phone. Their period of interception ended on April 6, 2018.  Their interception has shown that Manget PETERSON and his co-conspirators, to include MILLER, have continued with business as usual, at least as it pertains to their drug trafficking activities.  Below I discuss communications that were intercepted on Willie PETERSON's phone by DEA Detroit. These communications were given to me in summary form during my numerous conversations with the lead investigators with DEA Detroit.

33.  On March 21, 2018, investigators with DEA Detroit informed me that they intercepted multiple calls between MILLER and Willie PETERSON as MILLER attempted to be resupplied with heroin and cocaine.  According to the intercepted calls, MILLER was able to obtain approximately 9 ounces of cocaine, which MILLER intended to turn into 18 ounces of cocaine, some of which would be cooked into crack cocaine.  Investigators believe that MILLER was unable to obtain the resupply of heroin and after investigators intercepted multiple calls in which MILLER became frustrated at waiting for Willie PETERSON to obtain the heroin, MILLER departed Detroit.

C.  **March 29, 2018:  Drug Related Communications between MILLER and Willie PETERSON**

34.  On March 29, 2018, I was again informed by investigators with DEA Detroit that they had intercepted multiple calls between MILLER and Willie PETERSON.  Based on these calls investigators believed that once again MILLER had returned to Detroit, Michigan, to obtain more cocaine and heroin from Willie PETERSON. During one of the intercepted calls, MILLER indicated that he had already obtained "200" from his cousin.  Investigators continued to intercept call which indicated that MILLER was also attempting to obtain more cocaine.

35.  Investigators with DEA Detroit were able to conduct surveillance and observed a meeting between MILLER and Willie

PETERSON.  MILLER was driving a Chevy Impala rental vehicle bearing Alabama license plate 2BP7299.  Later that evening, investigators followed MILLER as he departed Willie PETERSON's residence and departed the Detroit metro area, likely en-route for West Virginia. Before MILLER left Michigan, investigators conducted a traffic stop on MILLER's rental vehicle.  Investigators searched the Chevy Impala and located a magnetic box on the undercarriage of the vehicle.  Inside the magnetic box were multiple bags of suspected heroin and cocaine.  In total the searched yielded approximately 200 grams of suspected heroin and approximately 117 grams of cocaine.  MILLER was released after the traffic stop to preserve the ongoing investigation.

**D.  Installation of Pole Camera at MILLER's Residence 761 Norway Ave, Huntington, West Virginia (Target Residence)**

36.  On or about January 30, 2018, investigators installed a remote video surveillance camera at MILLER's residence, 761 Norway Ave, Huntington, West Virginia (**Target Residence**).  This camera recorded continuously, more or less, until it was uninstalled on or about March 20, 2018.  During that timeframe, investigators observed MILLER at the residence on a regular basis during the early morning hours.  Investigators also observed MILLER's rental vehicles, which he changed regularly, parked at the residence. MILLER also had a dog that stayed in the fenced in yard.  Based on the recorded footage it appeared as though MILLER lived at 761

Norway Ave, Huntington, West Virginia (**Target Residence**). Although the camera was removed on or about March 20, 2018; investigators conducted a spot check on April 6, 2018, and observed MILLER's dog running around the fenced yard. The residence appeared the same as when the camera had been installed. Investigators believe MILLER still resides at 761 Norway Ave, Huntington, West Virginia (**Target Residence**).

## V.    KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

37. Based upon my training and experience, and my discussions with other experienced officers and agents experienced in drug investigations, I know the following:

a.    During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings that show ownership, dominion, and control of vehicles, residences, and/or storage units.

b.    It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their vehicles, residences, and/or storage units for their ready access and to conceal them from law enforcement.

c.    Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Narcotics

traffickers commonly "front," that is, provide on consignment, controlled substances to their clients. These books, records, receipts, notes, and ledgers, commonly known as "pay and owe sheets," are maintained where traffickers have ready access to them.

d.    Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes and vehicles. Sometimes, these locations are not their primary residence, but instead used for the purposes of storing and distributing drugs.

e.    Traffickers of controlled substances commonly maintain records reflecting names or nicknames, addresses, vehicles, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization. Traffickers commonly maintain this information in books or papers as well as in cellular telephones and other electronic devices. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing

narcotics business.   Traffickers frequently change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

f.   Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences and vehicles.  This evidence often includes more than contraband and paraphernalia and includes financial records, records of property and vehicle ownership, records of property rented, records of storage facilities used to hide drugs or currency, and other documentary evidence relating to commission of, and proceeds from, their crimes. Narcotics traffickers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product, or have photo or video security systems that record images from their homes or property.  These individuals usually maintain these photographs and recordings in their possession or at their premises, in a safe place.  Such evidence may be kept at a safe location for a long time after the drug deal(s) to which they pertain are completed, if the location remains under the control of the trafficker.

g.   Traffickers frequently maintain items necessary for weighing, packaging and cutting drugs for distribution.  This

paraphernalia often includes, but is not limited to, scales, plastic bags and other packaging materials, sifters, containers, and cutting/diluting agents and items to mask the odor of narcotics. Persons trafficking and using controlled substances frequently sell more than one type of controlled substance at any one time.

h. It is common for drug dealers to also be users of their product, and it is common for drug users to maintain paraphernalia associated with the use of controlled substances, such as syringes, pipes, spoons, containers, straws, and razor blades.

i. Traffickers frequently maintain records, books, notes, ledgers, travel documents, and other papers relating to the transportation and distribution of controlled substances in locations convenient to them, such as their residences and vehicles.

j. Traffickers often maintain weapons, including firearms and ammunition, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

k. Traffickers often have false identification documents and identification documents in the names of others. Traffickers very often place assets in names other than their own, or use fictitious names and identification,

to avoid detection of these assets by government agencies, while continuing to use these assets and exercise dominion and control over them.

l.    Drug trafficking is a cash business, and in order to escape notice from authorities for using unexplained income, or hide excessive cash from illegal activities, traffickers either keep large quantities of cash at home or other secure locations, such as safe deposit boxes, or convert the cash into other valuable assets, such as jewelry, precious metals, monetary instruments, or other negotiable forms of wealth.  Records of such conversions are often stored where a trafficker lives.

m.    A common method that drug traffickers use to distribute drugs is through the use of passenger vehicles. Similarly, the proceeds of the sales of drugs are sometimes transported back in the same manner.  Vehicles used by drug traffickers are often placed in fictitious or nominee names, and outfitted with concealed compartments where the drugs and drug proceeds can be hidden to lessen the likelihood of interdiction.

n.    Persons involved in drug trafficking conceal in their residences caches of drugs, large amounts of currency, financial instructions, precious metals, jewelry, and other items of value and/or proceeds of drug transactions as well

as evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in narcotics trafficking activities.

o.   Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

p.   Illegal drug trafficking is a continuing activity over months and even years.   Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale, and, similarly, drug traffickers will have an "inventory," which fluctuates in size depending upon various factors, including the demand and supply for the product.   I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money.   These records are often created in code.

38.   Based on my training and experience, and that of those around me, I also know that drug dealers use cellular telephones

as a tool or instrumentality in committing their criminal activity, to include laundering their proceeds. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. Since cellular phone use became widespread, every drug dealer I have contacted has used one or more cellular telephones for his or her drug business. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. These items may be kept for months and months in a safe place controlled by the drug trafficker. Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes. This includes the following:

a. The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN),

(International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source.

    b.   The stored list of recent received, missed, and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user. Identifying a defendant's law-abiding friends is

often just as useful as identifying his drug-trafficking associates.

c.   Stored text messages are important evidence, similar to stored numbers.  Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d.   Drug traffickers increasingly use applications on smart phones that encrypt communications such as WhatsApp, or applications that automatically delete messages, such as Snapchat, in order to avoid law enforcement monitoring or recording of communications regarding drug trafficking and/or money laundering.  Evidence of the use of such applications can be obtained from smart phones, and is evidence of a smart phone user's efforts to avoid law enforcement detection.

e.   Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user.  Pictures also identify associates likely to be members of the drug trafficking organization.  Some drug dealers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs.  Also, digital photos often have embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude

where the photo was taken.  Showing where the photo was taken
can have evidentiary value.  This location information is
helpful because, for example, it can show where
coconspirators meet, where they travel, and where assets
might be located

      f.  Stored address records are important evidence
because they show the user's close associates and family
members, and they contain names and nicknames connected to
phone numbers that can be used to identify suspects.

## VI.  CONCLUSION

39.  Based on the investigation to date, summarized above,
investigators believe the above described **Target Residence** is the
residence of MILLER.  Investigators believe that MILLER is a
heroin, cocaine, and crack cocaine trafficker in Huntington, West
Virginia.  Investigators believe that MILLER utilizes his
residence to maintain his supply of heroin and/or cocaine, store
monetary proceeds from his drug trafficking activities, as well as
other items of evidence as further described in Attachment B.

Charles Irwin, Special Agent
Drug Enforcement Administration

SUBSCRIBED AND SWORN before me this 16th day of April, 2018.

HONORABLE Cheryl A. Eifert
United States Magistrate Judge